# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| Sammie Lee Austin, Terrance Williams, and Dujuan Williams, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>METROPOLITAN COUNCIL through its operating division, METRO TRANSIT,<br><br>Defendants. | Civil Action No. _____ |

## CLASS ACTION COMPLAINT

Named Plaintiffs Sammie Lee Austin, Terrance Williams, and Dujuan Williams, by and through their attorney Kent M. Williams, state and allege as follows:

### INTRODUCTION

1.      Defendant Metropolitan Council ("Met Council") is a regional planning agency created by the Minnesota Legislature to provide essential services to the seven-country Twin Cities metropolitan area.  As part of its legislative mandate, Met Council operates one of the largest public transportation systems in the United States.  Through its operating division Metro Transit, the Met Council provides public transportation services to the seven-county Twin Cities metropolitan area, running over 100 bus routes and employing a fleet of over 900 buses.  The

Met Council employs over 1,000 bus drivers out of five garages, and relies heavily on state and federal funding to finance its operations and capital programs. The Met Council's Office of Diversity administers all of Met Council's equal opportunity policies and programs, and investigates discrimination complaints.

2.  Met Council claims to be an "equal opportunity and affirmative action employer," and pledges that it "will not tolerate discrimination by its employees or by those who receive federal funds from the Metropolitan Council." Yet, for years, through Metro Transit, Met Council has tolerated or even encouraged racial discrimination by Metro Transit against African American Metro Transit bus drivers. As detailed herein, Plaintiffs and proposed class representatives Sammie Lee Austin, Terrance Williams, Dujuan Williams, and all other present and future Metro Transit African American bus drivers (collectively "Plaintiffs") have been disciplined more harshly than Caucasian drivers for the same or substantially similar infractions. When certain Named Plaintiffs and other African American drivers complained about this unfair treatment, Defendants ignored their concerns, or even worse, retaliated by encouraging customers to file complaints against them, pursued trumped-up accusations, or recorded relatively insignificant complaints about their work. The purpose of this retaliation was either to make employment at Metro Transit so unpleasant that these employees would quit, or to build an adverse employment record sufficient to justify firing them for cause. As such, Defendants subject Metro Transit drivers to different terms and conditions of employment based on race.

3.  Defendants allow Metro Transit to operate through a culture of racial stereotypes and discriminatory practices. Because Caucasians are preferred for Metro Transit's management positions, Transportation Managers, Assistant Transportation Managers, District Street

2

Supervisors, and other Metro Transit management personnel are overwhelmingly Caucasian. Caucasian drivers and other employees are regularly promoted or transferred to more lucrative or otherwise relatively attractive positions over equally (or even more) qualified African American employees. Defendants relax employee conduct rules for Caucasian employees, but rigidly enforce them against African American employees. As a result, the employment records of African Americans are often riddled with baseless, one-sided, and/or trivial infractions that Caucasian employees are allowed to get away with, which are then cited as a basis for denying advancement to African Americans and are used to harass and intimidate African Americans into accepting continued employment at materially disadvantageous terms.

4.    This class action is brought on behalf of all present and future African American Metro Transit bus drivers. All African American Metro Transit bus drivers have an interest in a workplace that is free of racially discriminatory policies or practices. But, with Met Council's knowledge and support, Metro Transit has maintained, and continues to maintain, a pervasive policy or practice of racial discrimination in subjecting African Americans to disparate disciplinary treatment. This class action seeks to end these discriminatory policies and practices, by imposing injunctive relief to rectify Metro Transit's unfair policies and procedures, for all class members.

## JURISDICTION AND VENUE

5.    Plaintiffs' federal claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and 42 U.S.C. §§ 1981 and 1983. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiffs' state law claims, pursuant to 28 U.S.C. § 1367, as they form part of the same case or

controversy as the subject of Plaintiffs' federal law claims.

6.     Venue is proper in the District of Minnesota pursuant to 28 U.S.C. § 1391, as all Plaintiffs reside or have resided in this District, Defendants have headquarters in and/or can be found and conduct business in this District, and the events or omissions giving rise to Plaintiffs' claims occurred in this District

## THE PARTIES

7.     Plaintiff Sammie Lee Austin resides in Minneapolis, Minnesota.  Since October of 1994 he has been employed as a bus driver by the Metropolitan Council through its operating division, Metro Transit.  Mr. Austin is African American and a member of a protected race. During his employment, Mr. Austin was and continues to be subjected to discriminatory policies and practices by Metro Transit, including but not limited to unfair discipline, other disparate treatment, and retaliation.

8.     Plaintiff Terrance Williams resides in Minneapolis, Minnesota.  From May of 1999 through October of 2010 he was employed as a bus driver by the Metropolitan Council through its operating division, Metro Transit.  Mr. Williams is African American and a member of a protected race. During his employment, Mr. Williams was subjected to discriminatory policies and practices by Metro Transit, including but not limited to unfair discipline, other disparate treatment, retaliation, and wrongful termination.

9.     Plaintiff Dujuan Williams resides in Minneapolis, Minnesota.  Since September of 2008 he has been employed as a bus driver by the Metropolitan Council through its operating division, Metro Transit.  Mr. Williams is African American and a member of a protected race. During his employment, Mr. Williams was and continues to be subjected to discriminatory

policies and practices by Metro Transit, including but not limited to unfair discipline and other disparate treatment.

10.     Defendant Metropolitan Council ("Met Council") is a state agency created to provide essential services to the seven-county Minneapolis-St. Paul metropolitan area. Met Council provides public transportation services through its operating division, Metro Transit. Metro Transit operates bus service out of five garages: the Fred T. Heywood Building and Garage ("Heywood"), the East Metro Transit Facility ("East Metro"), the Martin J. Ruter Garage ("Ruter"), the Nicollet Garage ("Nicollet"), and the South Garage ("South").

To effectuate its mandate to provide public transportation services, Met Council entertwines operational responsibility between itself and Metro Transit management. Met Council participates in negotiating collective bargaining agreements between Metro Transit and Plaintiffs' union, Amalgamated Transit Union Local 1005 ("the Union"), and authorizes such agreements before they become effective. Met Council also promulgates employee policies and procedures affecting Metro Transit employees, keeps personnel records regarding Metro Transit employees, and pays the wages of Metro Transit employees. Met Council delegates other policy-making authority, and responsibility for Metro Transit's day-to-day operations, to Metro Transit management. Specifically, Met Council delegates some responsibility for compliance with Met Council's equal opportunity policies to Metro Transit management. Met Council's Office of Diversity, however, still retains overall responsibility for ensuring equal employment opportunity at Metro Transit, including investigating complaints regarding workplace discrimination. As used herein, all references to "Metro Transit" are intended to include, and do include, Met Council.

11.     All of the Plaintiffs named herein either are, or were, employed by Met Council as Metro Transit bus drivers.  During the class period, Met Council, through and with the assistance of Metro Transit employees as described herein, subjected the Named Plaintiffs and other African American bus drivers to racial discrimination.

## FACTUAL ALLEGATIONS

### The Named Plaintiffs

### Sammie Lee Austin

12.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

13.     Sammie Lee Austin has been employed as a bus driver at Metro Transit since October of 1994, and is currently employed in that position out of the Heywood Garage.

14.     In the summer of 2009, a Caucasian driver was habitually late relieving Mr. Austin on this route.  For three weeks Mr. Austin complained to management, to no avail.  It was not until Mr. Austin threatened to file a charge with the EEOC that management finally took action—by promoting the white driver to the position of trainer, a position with better pay.

15.     In late March of 2010, while operating his route, Mr. Austin was subjected to threats and physical intimidation by a white person not employed at Metro Transit.  Mr. Austin reported the harassment and asked to be switched to a different route.  Although the company has previously accommodated similar requests from white drivers, Mr. Austin's request was refused.  Mr. Austin ended up having to take personal days at his own expense to allow the situation to cool down so that he could drive his route without fearing for his physical safety.

16.     During Mr. Austin's employment and placement, Defendants discriminated

6

against Mr. Austin based upon his race, color, ancestry, and ethnicity.

17.     During Mr. Austin's employment and placement, Defendants subjected Mr. Austin to different terms and conditions of employment because of his race, color, ancestry, and ethnicity.

18.     The unlawful practices complained of in the preceding Paragraphs were intentional.

19.     The unlawful practices complained of in the preceding Paragraphs were done with malice or with reckless indifference to Mr. Austin.

20.     One or more of the unlawful practices complained of in the preceding Paragraphs was done in retaliation for Mr. Austin's opposition to Defendants' discriminatory policies and practices.

### Terrance Williams

21.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

22.     Terrance Williams was employed at Metro Transit as a bus driver from May of 1999 until October 1, 2010.  He drove out of the Heywood Garage.

23.     Mr. Williams has received commendations and awards for his driving at Metro Transit, including Outstanding Driver Awards and a Master Driver Award.

24.     In September of 2006, Mr. Williams filed a formal complaint with the Met Council's Office of Diversity alleging that the Garage Operations Manager and an Assistant Bus Transportation Manager had discriminated against Mr. Williams by deliberately failing to preserve evidence favorable to Mr. Williams in connection with a grievance proceeding.  After a

few weeks, Met Council's Office of Diversity informed Mr. Williams that there was nothing they could do. In the months and years that followed, management personnel retaliated against Mr. Williams by logging and/or filing virtually every customer complaint they received about Mr. Williams, regardless of whether it was corroborated or supported by evidence. Although these complaints and other adverse information were baseless, they were used against Mr. Williams to establish a "pattern" of misconduct.

25.     These alleged incidents were used to establish a so-called "pattern of complaints" regarding Mr. Williams's behavior. Much of the adverse material was not purged from Mr. Williams's employment file after three years, as required by the contract between Metro Transit and the Union. And, even when material was supposedly removed from Mr. Williams's employment file, it was still used against Mr. Williams in subsequent evaluations of Mr. Williams's work performance by upper management.

26.     In December of 2008, Mr. Williams was accused of striking a woman's walker with his bus. Mr. Williams denied the accusation, and a District Supervisor's report drafted moments after the incident indicated that there was no physical evidence of any contact between the walker and the bus. Nonetheless, Metro Transit discharged Mr. Williams and only reinstated him after he signed a "last chance" agreement which deprived him of the protections of the employment agreement between Metro Transit and his union. Metro Transit based its termination decision partly on previous adverse reports that were unfounded and that had supposedly been purged from Mr. Williams's employment file.

27.     After Mr. Williams was reinstated on less favorable terms in early 2009, he became aware that white drivers who had been accused of even more serious transgressions were

treated much more leniently.  In the fall of 2009, Mr. Williams learned that a few months earlier, a Caucasian bus driver had struck a pedestrian, but was not suspended, discharged, or subjected to any discipline at all.  Mr. Williams also learned that a couple of years earlier, another white driver deviated from his route while talking on his cell phone and then struck a pedestrian.  This driver was "suspended," but his "suspension" was meted out over weeks, on days that he normally took off anyway.  The white driver was also allowed to work overtime to make up for time lost due to his "suspension."

28.     The unfair logging and retention of disciplinary actions affected Mr. Williams' opportunity for advancement.  For example, in 2009, Mr. Williams expressed an interest in serving on the Heywood Garage Safety Committee.  Mr. Williams was informed by the Garage Operations Manager that he would not be allowed to serve on the Safety Committee because of the adverse information in his employment file, despite the fact that the adverse information was baseless and was only placed in his file as retaliation for his earlier accusations of racial bias.

29.     On October 1, 2010, Mr. Williams was terminated from employment with Metro Transit for supposedly violating his "last chance agreement" by having two customer complaints within a single year, despite the fact that there were still unresolved and pending proceedings contesting the legitimacy of these complaints.

30.     On information and belief, Metro Transit's treatment of Mr. Williams was a direct result of discriminatory policies and practices implemented by Defendants.

31.     During Mr. Williams's employment and placement, Defendants discriminated against Mr. Williams based upon his race, color, ancestry, and ethnicity.

32.     During Mr. Williams's employment and placement, Defendants subjected Mr.

Williams to different terms and conditions of employment because of his race, color, ancestry, and ethnicity.

33.     The unlawful practices complained of in the preceding Paragraphs were intentional.

34.     The unlawful practices complained of in the preceding Paragraphs were done with malice or with reckless indifference to Mr. Williams.

35.     One or more of the unlawful practices complained of in the preceding Paragraphs was done in retaliation for Mr. Williams's opposition to Defendants' discriminatory policies and practices.

### Dujuan Williams

36.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

37.     Dujuan Williams was hired by Metro Transit as a part-time driver in September of 2008.  From the start of his employment at Metro Transit, Mr. Williams was warned by his trainer not to fraternize with certain other African American drivers or he might "get into trouble."

38.     Mr. Williams started working full-time in March of 2010 at the Heywood Garage.

39.     In April of 2010, Mr. Williams applied for a position as vault-puller, which offered better pay and more convenient working hours.  The Metro Transit employee who was processing applications for the position, told Mr. Williams he would be given the position if he earned a perfect score on a qualifying test.

40.     On May 7, Mr. Williams was informed that he had earned a perfect score, and that

he would start in his new position the following week.   The Garage Operations Manager announced Mr. Williams's promotion to others at the company, and Mr. Williams began making personal arrangements to accommodate the new position, which involved different hours.

41.   Soon after he was awarded the vault-puller position, however, Mr. Williams was told by management that he had not been promoted to the position after all.  Instead, a white employee was given the position.  When Mr. Williams asked why he was not awarded the position as promised, management made various excuses.  At one point, he was told that the position went to the applicant with the most seniority.  Then Mr. Williams was told that he needed to complete six months of "probation," despite the fact that he went through the six-month probationary period when he was hired in 2008.  Mr. Williams has since learned that both before and after he was denied the position, white employees with less seniority then he, who have not completed their six-month probationary periods, were elevated to the same vault puller position that was denied to Mr. Williams.

42.   During Mr. Williams's employment and placement, Metro Transit discriminated against Mr. Williams based upon his race, color, ancestry, and ethnicity.

43.   During Mr. Williams's employment and placement, Metro Transit subjected Mr. Williams to different terms and conditions of employment because of his race, color, ancestry, and ethnicity.

44.   The unlawful practices complained of in the preceding Paragraphs were intentional.

45.   The unlawful practices complained of in the preceding Paragraphs were done with malice or with reckless indifference to Mr. Williams.

**Factual Allegations of Classwide Discrimination**

46.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

47.     The acts of discrimination identified, described and suffered by the Named Plaintiffs, are part of a general policy or practice of discrimination based upon race, color, ancestry, and ethnicity in employment that has existed at Metro Transit for a number of years. These are not isolated employment practices or individual decisions. On the contrary, these incidents are representative of Metro Transit's systemic, widespread, and continuing discrimination against African Americans and other persons of color in favor of Caucasian applicants and employees, all done in the course of Metro Transit's operations.  These policies and practices were designed and implemented with the knowledge and support of Met Council. As such, they constitute an official policy or custom of discriminating against African American drivers with respect to the logging of complaints and appropriate discipline, and as such, terms and conditions of employment.

48.     Upon information and belief, Metro Transit operates bus service twenty-four (24) hours a day.  Over 100 routes are run with 900 buses out of five garages.

49.     Upon information and belief, Metro Transit employs over 1,000 part-time and full-time drivers, approximately fifty percent (50%) of whom are African American.

50.     Upon information and belief and at all relevant times, Metro Transit has been unwilling to promote African American bus drivers to supervisory or other management positions.  Although Metro Transit has promoted a few African Americans to lower-level management positions (such as Assistant Bus Transportation Manager), these promotions have

been few and far between, and have only been made to create an appearance of equality. In reality, the vast majority of African Americans are denied promotions because their employment files are loaded with adverse employment actions that are racially motivated. Those who persist in applying for promotions are usually turned down.

51.     As a result of Defendants' policies and practices, African American bus drivers have applied for and been denied advancement opportunities afforded to other non-African American employees within Metro Transit.

52.     On information and belief, African Americans who complain about racial discrimination are targeted with threats, harassment, and intimidation in the form of constant scrutiny, harsh criticism and baseless accusations about the quality of their work, and other mistreatment. As a matter of policy set by Metro Transit management, petty and/or unfounded customer complaints and other allegations are routinely logged and recorded in the employment files of African American drivers, especially those who complain about racially-motivated mistreatment. These allegations are then cited as "evidence" and used against the driver as part of formal proceedings subjecting the driver to discipline.

53.     Caucasians are not treated the same as African Americans. Caucasians are not targeted with unfounded complaints and other misconduct, their employment files are kept relatively clean, and as such, they are frequently elevated to better-paying positions over African Americans with more seniority and/or higher qualifications. Petty or unsupported complaints and other allegations of misconduct against Caucasians are discounted or ignored. Even in instances of serious misconduct, white drivers on the whole are not treated as harshly as black drivers.

54.     Metro Transit's management is disproportionately Caucasian.  None of the five Garage Operations Managers are (or ever have been) African American.  Upon information and belief, of the approximately twenty-five Assistant Transportation Managers, fewer than five are African American.  Upon information and belief, of the approximately fifteen District Street supervisors, only three or four are African American. Upon information and belief, of the approximately fifteen Transit Control Center supervisors, only three or four are African American.   Yet, upon further information and belief, approximately half of the bus drivers at Metro Transit are African American. The disparity is at least partly if not completely due to a racial preference for management who are not African American, as described above.

55.     Defendants' and arbitrary prosecution of African American drivers for spurious and/or petty allegations acts as a bar to advancement within the organization.  False, unfounded accusations against African American drivers are routinely recorded in the drivers' employment files, and are used to discourage, disqualify or otherwise prevent these drivers from obtaining promotions, transfers to more desirable positions, or other advancement.   These unfounded accusations are also used to threaten African American drivers with termination, and to obtain "last chance" employment agreements at relatively disadvantageous terms compared to terms enjoyed by Caucasian and other non-African American drivers.

56.     Defendants also treat African American Metro Transit bus drivers differently than similarly situated non-African American drivers in assigning work, routes, and buses to their employees.  For example, some of the buses in Metro Transit's fleet are newer than others buses in the fleet.  New buses have more advanced video recording equipment that enables high-quality recording of events on these buses, and allows those recordings to be preserved for

longer, than recording equipment on older buses. Upon information and belief, Defendants disproportionately assign African American drivers to older buses with lower-quality video recording equipment. Consequently, when dubious accusations are made against an African American driver, often no video record is available to disprove the accusations.

57.     The disparate treatment described above was due to the African American drivers' race, color, ancestry, and ethnicity, and was unwelcome, offensive and was sufficiently pervasive as to alter the conditions of their employment.

58.     The foregoing, and other differential terms and conditions of employment, represents treatment not experienced by similarly situated Caucasian bus drivers as well as excessive criticism and discipline not otherwise accorded to Caucasian drivers.

59.     All the above actions were taken by Defendants to deprive the Named Plaintiffs and members of the putative class of equal terms and conditions of employment and other contractual opportunities, as those afforded to other, non-African American bus drivers.

60.     Plaintiffs and members of the putative class are thus entitled to injunctive relief ending the disparate treatment, and ensuring that all drivers are treated fairly, regardless of their race.

## CLASS ACTION ALLEGATIONS

61.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

62.     The Named Plaintiffs bring this action on their own behalf, and on behalf of similarly-situated persons under Rule 23(a) and Rule 23(b)(2) and (b)(3) of the federal Rules of Civil Procedure.

63.     The Named Plaintiffs seek to represent a class consisting of:

> All present and future African American employees of the
> Metropolitan Council employed as Metro Transit bus drivers.

Plaintiffs reserve the right to amend the definition of the putative class following discovery.

64.     Members of the putative class are so numerous that joinder of all such members is impracticable. Although the exact size of the putative class is unknown at this time, it is believed and alleged that the number of African Americans employed by Met Council as Metro Transit bus drivers exceeds five hundred (500) persons.

65.     There are common questions of law and fact applicable to the putative class with respect to liability issues, relief issues and anticipated affirmative defenses, including but not limited to:

a.      whether Defendants' policies and practices violate federal civil rights laws, in particular 42 U.S.C. §§ 1981 and 1983;

b.      whether Defendants' policies and practices violate state civil rights laws, in particular Minn. Stat. §§ 363A.08 and 363A.15;

c.      whether Defendants maintain written and unwritten policies and/or practices whereby unfounded and/or spurious accusations about members of the putative class are recorded and maintained in their employment files;

d.      whether Defendants maintain written and unwritten policies and practices to withhold, overwrite, record over, not preserve, alter, destroy, or

otherwise deprive African American drivers of evidence that would tend to disprove the accusations made against them;

e.   whether Defendants maintain written and unwritten policies and/or practices of targeting African American drivers who complain about discrimination or the company's unfair practices and policies as a result of that discrimination;

f.   whether Defendants maintain written and unwritten policies and/or practices for determining bus and/or job assignments that discriminate against members of the putative class on the bases of race, color, ancestry, and ethnicity;

g.   whether Defendants maintain written and unwritten disciplinary policies and/or practices that discriminate against members of the putative class on the bases of race, color, ancestry, and ethnicity;

h.   whether Defendants maintain written and unwritten policies and/or practices for determining promotions awarded to members of the putative class on the bases of race, color, national origin, ancestry, ethnicity, creed and religion;

i.   whether Defendants maintain written and unwritten policies and/or practices for providing access to and selecting participants for classes, committees, courses, or other programs on the bases of race, color, ancestry, or ethnicity;

j.   whether Defendants failed to monitor their human resources and

17

employment policies and practices adequately to ensure equal employment opportunity;

k. whether Defendants had knowledge of racial and ethnic disparities in discipline, promotion, assignments, programs, and/or Metro Transit's diversity performance, and what, if any, actions were taken as a result of that knowledge;

l. whether Defendants' policies or practices resulted in disparate impact adverse to African American bus drivers such that it altered the terms and conditions of their employment;

m. whether Defendants' conduct constitutes a pattern and practice of discrimination against members of the putative class such that it constitutes an official policy or custom; and

n. whether injunctive relief, including changes to Metro Transit's company-wide written and unwritten policies and practices, is needed to adequately remedy past and present discrimination against members of the putative class and prevent future discrimination against members of the putative class.

66. The claims and defenses of the Named Plaintiffs are typical of other class members, in that all African-American bus driver have been subjected to, and/or are exposed to, arbitrary and unfair disciplinary action on the basis of their race.

67. The Named Plaintiffs will fairly and adequately protect the interests of the putative class. They have no conflicts with the putative class members. The Named Plaintiffs

have retained counsel competent and experienced in complex class action litigation.

68.     Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because (a) the prosecution of separate actions by putative class members would create a risk of inconsistent or varying adjudications with respect to individual members that would establish incompatible standards of conduct for Defendants, or (b) alternatively, the prosecution of separate actions by the putative class members would create a risk of adjudications with respect to individual members that would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

69.     Class certification is also appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants acted and/or refused to act on grounds generally applicable to the putative class, making appropriate declaratory and injunctive relief with respect to the Named Plaintiffs and the class as a whole. The putative class members are entitled to injunctive relief to end Defendants' common, uniform, and unfair discriminatory employment policies and practices.

## COUNT I
## INTENTIONAL DISCRIMINATION
## IN VIOLATION OF TITLE VII
### (42 U.S.C. §§ 2000e, et. seq.)

70.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

71.     The conduct alleged herein, violates Title VII of the Civil Rights Act of 1964, as amended, in that Metro Transit has, among other things, maintained a pattern and practice of purposefully discriminating against African American bus drivers on the basis of race.

72.     As a direct, proximate and foreseeable result of Metro Transit's discriminatory actions, the Named Plaintiffs and putative class members have been, and continue to be, damaged.

73.     The Named Plaintiffs and putative class members are entitled to injunctive relief, along with costs, expenses, and attorneys' fees.

74.     The Named Plaintiffs each filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), and each of them received a Notice of Right to Sue from the Department of Justice. *See attached* Group Exhibits A and B. The Named Plaintiffs, on behalf of themselves and all other current and former African American bus drivers as a class, have therefore exhausted their administrative remedies and fulfilled all conditions precedent to filing suit in federal court.

### COUNT III
### RETALIATION IN VIOLATION OF TITLE VII
### (42 U.S.C. Sec. 2000e-3(a))

75.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

76.     Title VII expressly proscribes retaliation against anyone who has opposed any practice made an unlawful employment practice by Title VII or who has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Title VII statutory scheme.

77.     The complaints made by Named Plaintiffs and other members of the putative class regarding workplace discrimination were an activity protected by Title VII.

78.     At all material times, Metro Transit was aware of the complaints made by Named Plaintiffs and other class members regarding workplace discrimination.

79.     After being made aware of the complaints made by the Named Plaintiffs and other class members regarding workplace discrimination, Metro Transit took adverse employment actions against them.   These adverse employment actions included, but were not limited to:   bringing unfounded charges of misconduct, assigning them older buses with lower-quality equipment, denying them promotions or other advancement, and/or terminating the employment relationship.

80.     The adverse employment actions were motivated by, and in retaliation for, the complaints made the Named Plaintiffs and other class members about workplace discrimination.

81.     As a direct, proximate and foreseeable result of Metro Transit's retaliation, the Named Plaintiffs and putative class members have been, and continue to be, damaged.

82.     The Named Plaintiffs and putative class members are entitled to injunctive relief, along with costs, expenses, and attorneys' fees.

## COUNT IV
## INTENTIONAL DISCRIMINATION
## IN VIOLATION OF SECTIONS 1981 AND 1983
## (42 U.S.C. §§ 1981, 1983)

83.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

84.     Pursuant to 42 U.S.C. § 1981, it is illegal for a public or private employer to infringe on a person's right to make and enforce contracts or to full and equal benefit of all laws for the security of persons and property.   In the case of a state actor, a violation of § 1981 is

actionable pursuant to 42 U.S.C. § 1983 if the person acted under color of state law in discriminating against the plaintiff.

85.    As union members, Plaintiffs are beneficiaries of the contract between their union and Metro Transit. Plaintiffs and members of the putative class enjoy the same rights as non-African American union members in the making, performance, modification, and termination of this contract, and in the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

86.    Metro Transit maintained an intentionally discriminatory system with respect to discipline, assignment, promotion, termination, compensation, and other terms and conditions of employment. Metro Transit acted under color of state law in that it created and maintained a system of race discrimination so pervasive it established an official policy or custom fairly attributable to the Met Council, a creation of the State.

87.    The foregoing conduct constitutes illegal intentional discrimination with respect to the making, performance, modification, and termination of contracts prohibited by 42 U.S.C. §§ 1981 and 1983.

88.    As a direct, proximate and foreseeable result of Defendants' intentional discrimination in violation of 42 U.S.C. §§ 1981 and 1983, the Named Plaintiffs and putative class members have been, and continue to be, damaged.

89.    The Named Plaintiffs and putative class members are entitled to injunctive relief, along with costs, expenses, and attorneys' fees.

## COUNT V
## RETALIATION IN VIOLATION OF 42 U.S.C. §§ 1981 AND 1983
### (42 U.S.C. §§ 1981, 1983)

90.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

91.     Pursuant to 42 U.S.C. § 1981, it is illegal for a public or private employer to retaliate against a person for complaining about activity protected by Section 1981.  In the case of a state actor, a violation of § 1981 is actionable pursuant to 42 U.S.C. § 1983 if the person acted under color of state law in discriminating against the plaintiff.

92.     The complaints made by Named Plaintiffs and other members of the putative class regarding workplace discrimination were an activity protected by Section 1981.

93.     At all material times, Metro Transit was aware of the complaints made by Named Plaintiffs and other class members regarding workplace discrimination.

94.     After being made aware of the complaints made by the Named Plaintiffs and other class members regarding workplace discrimination, Metro Transit took adverse employment actions against them.  These adverse employment actions included, but were not limited to:   promulgating and demanding imposition of relatively harsh disciplinary actions, bringing unfounded charges of misconduct, assigning older buses with lower-quality equipment, denying promotions or other advancement, and/or terminating the employment relationship.

95.     The adverse employment actions were motivated by, and in retaliation for, complaints made the Named Plaintiffs and other class members about workplace discrimination. Metro Transit acted under color of state law in that the retaliation was so pervasive it established an official policy or custom fairly attributable to the Met Council, a creation of the State.

96.     As a direct, proximate and foreseeable result of this retaliation, the Named Plaintiffs and putative class members have been, and continue to be, damaged.

97.     The Named Plaintiffs and putative class members are entitled to injunctive relief, along with costs, expenses, and attorneys' fees.

## COUNT VI
## UNFAIR EMPLOYMENT PRACTICES
## IN VIOLATION OF <u>MINN</u>. <u>STAT</u>. § 363A.08

98.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

99.     Minnesota's Human Rights Act, <u>Minn</u>. <u>Stat</u>. § 363A.08 subd. 2 (2010), broadly prohibits an employer from engaging in employment practices that discriminate against applicants and employees on the bases of, inter alia, race, color, creed, religion, and national origin.

100.    By engaging in the conduct described herein, Metro Transit violated and continues to violate <u>Minn</u>. <u>Stat</u>. § 363A.08, subd.2 and, as a result, Named Plaintiffs and putative class members have been continuously and unlawfully denied equal employment opportunities by Metro Transit.

101.    The individual disparate treatment suffered by Plaintiffs and putative class members is part of a pattern and practice of general discriminatory treatment toward members of Plaintiffs' protected classes.

102.    Metro Transit has maintained a system of employment which unreasonably excludes persons seeking employment on the bases of race, color, creed, religion, and national origin.

103.   Metro Transit has discharged certain Named Plaintiffs and members of the putative class because of their race.

104.   Metro Transit has discriminated against Named Plaintiffs and members of the putative class with respect to hiring, disciplining, promoting, conditions, facilities, and privileges of employment because of their race, color, ethnicity, and ancestry.

105.   Metro Transit's unfair and discriminatory employment practices have a disparate impact on Named Plaintiffs and members of the putative class.

106.   As a direct, proximate and foreseeable result of Metro Transit's unfair and discriminatory employment practices in violation of  Minn. Stat. § 363A.08, subd.2, Named Plaintiffs and members of the putative class have been, and continue to be, damaged.

107.   Named Plaintiffs and putative class members are entitled to injunctive relief, as well as reasonable attorneys' fees.

## COUNT VII
## REPRISAL IN VIOLATION OF MINN. STAT. § 363A.15

108.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

109.   Pursuant to Minnesota's Human Rights Act, Minn. Stat. § 363A.15(1) (2010), it is an unfair discriminatory practice for any employer, or any employee or agent thereof, to engage in any reprisal against any person because that person opposed a practice forbidden under the Minnesota Human Rights Act.

110.   A reprisal forbidden by this section includes, but is not limited to, "any form of intimidation, retaliation, or harassment."

111.    Upon information and belief, Metro Transit has engaged in reprisals against named Plaintiffs and putative class members who have opposed practices forbidden under the Minnesota Human Rights Act. Such reprisals include, by way of example and not by limitation: bringing unfounded and otherwise spurious accusations against African American drivers who complain about workplace discrimination; constantly monitoring and tracking African American drivers who complain about workplace discrimination more frequently than Caucasian and other drivers; and refusing reasonable requests for accommodations in particular circumstances that are routinely provided to Caucasian and other non-African American drivers.

112.    As a result of Defendant's retaliatory conduct in violation of Minn. Stat. § 363A. 15, Named Plaintiffs and putative class members have been, and continue to be, damaged.

113.    Named Plaintiffs and putative class members are entitled to injunctive relief and reasonable attorneys' fees.

### PRAYER FOR RELIEF

WHEREFORE, Named Plaintiffs, on behalf of themselves and others similarly situated, respectfully request that this Court:

1.    Certify this as a proper class action;

2.    Enter a declaratory judgment that the practices complained of herein are unlawful and violate the federal and state statutes cited above;

3.    Enter a preliminary and permanent injunction against Met Council, Metro Transit, and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in the unlawful policies, practices, customs, and usages set forth herein;

4.    Enter an order that Met Council and Metro Transit institute and carry out polices, practices, and programs that provide equal and fair discipline for all employees, and that it eradicate the effects of its past and present unlawful employment practices;

5.     Enter an order restoring Named Plaintiffs and the Class to their rightful positions at Metro Transit;

6.     Award Named Plaintiffs and the Class costs incurred herein, including reasonable attorneys' fees to the extent allowable by law; and

7.     Grant such further relief as the Court deems necessary and proper.


Dated:     December 16, 2011      By: _____

Kent M. Williams (Minn. Atty No. #222884)

Kent M. Williams
WILLIAMS LAW FIRM
1632 Homestead Trail
Long Lake, MN 55356
763-473-0314
williamslawmn@aol.com


ATTORNEY FOR PLAINTIFFS